**VEERE INC., Plaintiff,**

v.

**The FIRESTONE TIRE & RUBBER COMPANY, et al., Defendants.**

No. C88–0571A.

United States District Court, N.D. Ohio, E.D.

March 16, 1988.

Norman S. Jeavons, Michael J. Mahoney, Baker & Hostetler, Cleveland, Ohio, Shearman & Sterling, New York City, for plaintiff.

Patrick F. McCartan, John M. Newman, Jr., John W. Edwards, II, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants.

Anthony J. Garofoli, Dennis R. Wilcox, John M. Masters, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., LPA, Cleveland, Ohio, for plaintiff-intervenor.

Mary G. Kirchner, Peter D. Patitsas, Asst. Attys. Gen., Columbus, Ohio, for State defendants.

BATCHELDER, District Judge.

## MEMORANDUM OF DECISION

This matter is before the Court on the motion of plaintiff, Veere Inc. for preliminary injunction, in which motion Veere Inc. is joined by intervening plaintiff, a Firestone shareholder whose motion to intervene was granted at the time of the injunction hearing.

Veere Inc. has commenced a tender offer to purchase all of the outstanding shares of defendant Firestone. Although Veere has delivered to Firestone the Acquiring Person Statement required by Ohio Revised Code § 1701.831, Veere has filed this action, challenging, inter alia, the constitutionality of the Ohio Statute, both on preemption and Commerce Clause grounds, and asking for preliminary and permanent injunctive relief. Although the plaintiffs also challenge the constitutionality of Ohio Revised Code §§ 1707.041 and 1707.042 (Ohio's Take–Over and Anti–Fraud Statutes) the parties agreed at the hearing that there has been no attempt to enforce either of those statutes and the issues are therefore not ripe for review. Accordingly, this decision and order address only the challenge to Ohio Revised Code § 1701.831.

It is well settled that on motion for preliminary injunction, the court must consider whether the plaintiffs have shown a strong or substantial likelihood of success on the merits, whether the plaintiffs have shown irreparable injury, whether the issuance of a preliminary injunction would cause substantial harm to others, and whether the public interest would be served by issuing a preliminary injunction. *Mason County Medical Association v. Knebel*, 563 F.2d 256 (6th Cir.1977); *Forry Inc. v. Neundorfer Inc.*, 837 F.2d 259 (6th Cir.1988). Thus, in determining whether to grant the preliminary injunction sought by these plaintiffs, the court must look first to the issue of plaintiffs' likelihood of succeeding on their claim that Ohio Revised Code § 1701.831 is unconstitutional because it has been preempted by the Williams Act and/or it creates an impermissible burden on interstate commerce.

## PRE–EMPTION

Turning first to the issue of whether the Williams Act preempts the Ohio statute, it is apparent from the briefs of the parties, the expert testimony presented by both plaintiff Veere Inc. and defendant Firestone at the hearing on the motion for preliminary injunction, and the arguments of all parties, that the parties all agree that this issue is governed by the recent Supreme Court decision in *CTS Corp. v. Dynamics Corp. of America*, —— U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), in which the Court held that an Indiana statute similar to the Ohio statute at issue here was not pre-empted by the Williams Act. Each party finds language in that opinion which provides comfort for its respective position, and indeed, to some extent the same language is relied on by all. Thus, it is the task of this court to determine whether the differences between the Ohio and Indiana statutes in relation to the Williams Act are substantively significant for purposes of preemption analysis pursuant to *CTS*.

The Williams Act together with the regulations of the Securities and Exchange Commission promulgated pursuant to the Act (hereinafter referred to as "the Act,") requires a tender offeror to file certain disclosures relative to its offer to purchase shares of the target company, and establishes the procedures which govern the tender offer. Specifically, the Act requires that any tender offer must remain open for no less than twenty business days from commencement; permits tendered shares to be withdrawn at any time during the period that the offer remains open; requires the offeror, upon termination or withdrawal of the offer promptly to pay the requisite consideration for or to return the shares which have been deposited pursuant to the offer; and provides for a revival of the right of withdrawal of tendered shares at any time after sixty days from the date of the offer, in the event the tender offer has not been earlier consummated. In addition, the Act provides for pro rata purchase of tendered shares in the

event more shares are tendered than the offeror sought to purchase, and requires that the offeror must pay the same price for all shares purchased as part of the tender offer transaction.

The Indiana Control Shares Acquisition Chapter (hereinafter the "Indiana Act") applies only to "issuing public corporations," which are defined as businesses incorporated in Indiana, having one hundred (100) or more shareholders, whose principal place of business, principal office or substantial assets are located within Indiana, and having either more than ten percent of its shareholders resident in Indiana, or more than ten percent of its shares owned by Indiana residents, or ten thousand shareholders resident in Indiana. The Indiana Act requires that whenever an entity acquires "control shares" in an issuing public corporation, *i.e.*, shares that, but for the operation of the Indiana Act, would bring the acquiring entity's voting power in the corporation to or above any of three threshhold levels, the acquiring entities shall only obtain the voting rights for those shares upon approval by a majority vote of the disinterested shareholders holding each class of stock. The acquiring entity can require management of the target company to hold a special meeting within fifty days of its filing an "acquiring person statement," at which meeting the shareholders may vote either to restore or to withhold the voting rights from the acquired shares. In the event that the shareholders do not vote to restore the voting rights, the corporation has the right but not the obligation to redeem the acquired shares at fair market value.

The Ohio Control Share Acquisitions Act (hereinafter the "Ohio Act") applies only to "issuing public corporations" which have not, through their articles or regulations, opted not to be covered by its provisions. An "issuing public corporation" is defined

as "a domestic corporation with fifty or more shareholders that has its principal place of business, principal executive offices, or substantial assets within [Ohio], and as to which no valid close corporation agreement exists ..."[1]

The Ohio Act requires that any entity proposing to make a "control share acquisition," *i.e.*, an acquisition of shares which would bring the voting power of the acquiring entity to or above any of three threshhold levels, must obtain the prior authorization of a majority of the disinterested shares of the corporation. The acquiring entity is required to deliver to the issuing public corporation an "acquiring person statement" containing specific disclosure information, and the corporation's directors are required to call a special meeting of the shareholders within fifty days of the receipt of such statement, for the purpose of voting on the proposed acquisition of the control shares.

A review of the Ohio Act clearly reveals that it is physically possible for entities to comply both with its provisions and those of the Williams Act,[2] just as the Supreme Court found the case to be with the Indiana Act. Thus, like the Indiana Act, the Ohio Act can be pre-empted only if it frustrates the purposes of the Williams Act. Further, since the Supreme Court found that the Indiana Act was not so pre-empted, it is necessary to examine the differences between the Indiana Act and the Ohio Act, and to determine whether those differences, even if found to be substantial, are material in light of the purpose of the federal law.

■ The *CTS* Court, while finding that the Indiana Act passed muster even under the broad interpretation of the Williams Act enunciated in *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) noted that because *MITE* was a plurality opinion, the court was not bound by

1. Ohio Revised Code § 1701.01(Y).

2. Since, as is the case with the Indiana Act, consummation of a tender offer pursuant to the Ohio Act may be accomplished within the sixty day maximum period of the Williams Act, and since the Ohio Act prohibits an offeror from

taking advantage of the minimum offer time allowed by the Williams Act but does not, in any other regard, conflict with the mandatory "prompt" take-down requirements of the Williams Act, this Court rejects the argument that compliance with both Acts is impossible.

its reasoning, and emphasized the earlier statement of the purpose of the Williams Act contained in *Piper v. Chris–Craft Industries*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed. 2d 124 (1977) *viz.* "... plac[ing] investors on an equal footing with the take-over bidder." *CTS* 107 S.Ct. at 1645. The significance of this approach is apparent when one examines, first, the plurality opinion in *MITE*, wherein three Justices concluded that the Williams Act was intended to strike a balance between the offeror and the target company, and that any state legislation tending to tip that balance was pre-empted; and then the opinion in *Piper v. Chris–Craft*, wherein the majority of the Court held that "... the sole purpose of the Williams Act was the protection of the investors who are confronted with a tender offer." *Piper*, 97 S.Ct. at 946. The conclusion appears inescapable to this court that a majority of the Court now views the purpose of the Williams Act, not as a guarantee of a level playing field for offeror and management in the take-over game, although that level playing field must be regarded as a means toward achieving the Act's real purpose, but as protection for the investor while management and offeror are on the field.

That conclusion is bolstered by the discussion in *CTS* of the coercive nature of tender offers.

"The Indiana Act operates on the assumption, implicit in the Williams Act, that independent shareholders faced with tender offers are often at a disadvantage. By allowing such shareholders to vote as a group, the Act protects them from the coercive aspects of some tender offers. If, for example, shareholders believe that a successful tender offer will be followed by a purchase of nontendering shares at a depressed price, individual shareholders may tender their shares—even if they doubt the tender offer is in the corporation's best interest—to protect themselves from being forced to sell their shares at a depressed price. As the SEC explains: 'The alternative of not accepting the tender offer is virtual assurance that, if the offer is successful, the shares will have to be sold in the lower priced, second step.' ... In such a situation under the Indiana Act, the shareholders as a group, acting in the corporation's best interest, could reject the offer, although individual shareholders might be inclined to accept it. The desire of the Indiana Legislature to protect shareholders of Indiana corporations from this type of coercive offer does not conflict with the Williams Act. Rather, it furthers the federal policy of investor protection."
*CTS Corp.*, 107 S.Ct. at 1646.

Having concluded that the purpose of the Williams Act is the protection of investors by placing them on an equal footing with the take-over bidder, the next logical question appears to be, "from what do the investors need protection in the context of a tender offer?" It is in the context of this question that the differences between the Ohio and Indiana Statutes must be examined.

The Ohio Act is substantially similar to the Indiana Act in procedures and time frames, with one significant difference. Where the Indiana Act permits the acquiring person to purchase or "take-down" the tendered shares on the first day permitted by the Williams Act, but requires that within a fifty day period the shareholders holding the disinterested shares must vote either to confer or to withhold voting rights relative to those shares, the Ohio Act requires that the shareholders vote within the fifty day period either to authorize or not authorize the outright acquisition of the shares.

It is clear that the parties do not dispute that this constitutes a very real difference between the Indiana Act and the Ohio Act. Neither do the parties dispute that common share ownership includes both the economic claim to cash distributions to equity holders and the right to vote the shares. Furthermore, although the expert testimony presented by Veere Inc. at the injunction hearing differed markedly from that presented by Firestone relative to the desirability as a matter of economics and take-over strategy of the offeror's having the right to purchase the economic rights of

equity holders at the earliest possible time, all of the opinion testimony acknowledged that the ultimate goal of the take-over bidder is to obtain voting control of the target company.

■ Although the question was not directly addressed to either of the experts, their testimony as a whole makes it abundantly clear that investors faced with a tender offer do not need to be protected from an offeror's obtaining the equity holders' rights to participate in the economic aspects of share ownership. To the extent that those investors need protection, it is from the activity incident to the offeror's attempt to take control of the target company and the consequences to the shareholders of that activity. Clearly, the' Williams Act is directed toward the control acquisition aspects of the tender offer.

■ It was in relation to the acquisition of control that the Supreme Court analysed the Indiana Statute. There is no question that the court distinguished that statute from the offending Illinois statute struck down in *MITE*, and noted that the Indiana statute did not prohibit the offeror from consummating an offer on the earliest date permitted by the Williams Act. However, the court in *CTS* specifically stated that even if the Indiana Act did impose some absolute delay on tender offers, it was not an indefinite delay, as the delay required by the Illinois statute was, the *MITE* plurality merely held that "unreasonable delay" was impermissible, and the fifty day time frame within which the offeror pursuant to the Indiana Act will gain voting rights, *i.e.* control, of the target company, falling as it does within the sixty day time frame of the Williams Act, could not be said to be unreasonable.[3]

There is also no question that the Ohio Act does prohibit the offeror from consummating an offer on the earliest date permitted by federal law. However, the Ohio Act does not impose an indefinite delay any more than the Indiana Act does. Although the Ohio Act prohibits the offeror from obtaining the economic benefit rights to the tendered shares as well as the voting rights to those shares unless and until the shareholders authorize the acquisition, the Ohio Act is virtually identical to the Indiana Act as it relates to acquisition of control of the target company.

Thus we come to the ultimate question in this pre-emption analysis: Is the essential difference between the Ohio and Indiana Acts, *i.e.* the fact that under Ohio law the tender offeror *must* hold open his tender offer for longer than the minimum period provided by federal law in order to obtain acquisition of control shares whereas the tender offeror under Indiana law *may* hold open his offer for the longer period but need not do so in order to obtain the economic benefits of share ownership, the delay being applicable only to acquisition of voting rights, sufficient to require a finding that the Ohio Act frustrates the purpose of the Williams Act, while the Indiana Act does not?

The plaintiffs have not demonstrated a substantial likelihood that such a finding is required pursuant to the holding in *CTS*. The purpose of the Williams Act is to protect investors against the coercive effects of tender offers and to put them on an even footing with the offerors. The court in *CTS* suggested that an acceptable alternative for the Indiana take-over bidder was to make a conditional offer, the effect of which would be to impose the same fifty day delay on purchase of shares that the Ohio Act imposes. The fact that this delay on acquisition of the economic incidents of share ownership in Indiana would be voluntary, while in Ohio it is not, is not material, since the pre-emption analysis required in regard to the Ohio Act is limited to the issue of frustration of purpose of the federal law, and that purpose is to provide protection to the investors in regard to the control aspects of the take-over bid. Thus, the Ohio Act, although different from the Indiana Act, is susceptible of the same pre-emption analysis, and, by allowing the shareholders collectively to evaluate the fairness of the tender offer and to vote as

3. *CTS* 107 S.Ct. at 1647.

a group, the Ohio Act furthers the federal policy of investor protection.

## COMMERCE CLAUSE

■ The plaintiffs have also challenged the constitutionality of the Ohio Act on the grounds that it violates the Commerce Clause. This attack was also made on the Indiana Act and the Supreme Court in *CTS* found the challenge to be without merit, noting first that the Indiana Act did not discriminate against interstate commerce, since it had the same effect on both resident and non-resident offerors. Neither did the court find that the Indiana Act subjected activities to inconsistent state regulations since it purported to regulate only the voting rights in corporations which the state of Indiana had created.

Certainly the same analysis results in the finding that the Ohio Act neither discriminates against interstate commerce nor subjects activities to inconsistent state regulation, since the Ohio Act also has the same effects on resident as on non-resident offerors, and it also applies only to the control acquisition of corporations which Ohio has created.

Specifically, the *CTS* court held "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders. *See* Restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should 'determine the right of a shareholder to participate in the administration of the affairs of the corporation')." *CTS* at 1649. While there is, as has been set forth hereinabove, an economic difference between the Ohio and the Indiana Acts, the Ohio Act nonetheless regulates voting rights of shareholders and the rights of shareholders to participate in the administration of the affairs of the corporation, and it does so only as to those corporations chartered in Ohio. Certainly

the rights of shareholders to act as a group in determining whether to authorize a control share acquisition, the impact of which on the administration of the affairs of the corporation may be enormous, must be included as a "right of a shareholder to participate in the administration of the affairs of the corporation."

Neither does the Ohio Act create an impermissible burden on interstate commerce. As did the Indiana Act, the Ohio Act applies only to domestic corporations, over whose governance Ohio has a clear right to regulate. *CTS* at 1649. Although in the context of the particular tender offer at issue here, it is tempting to observe that defendant Firestone has, by its recent activities, chosen to deprive itself of some of the persuasive force of Justice Powell's concurring opinion in *MITE*,[4] nonetheless, it remains the fact that the Supreme Court has reaffirmed in *CTS* that "[A] change of management may have important effects on the shareholders' interests; it is well within the State's role as overseer of corporate governance to offer this opportunity. The autonomy provided by allowing shareholders collectively to determine whether the take-over is advantageous to their interests may be especially beneficial where a hostile tender offer may coerce shareholders into tendering their shares." *CTS* at 1651.

As did Dynamics Corp. in the *CTS* case, plaintiff Veere Inc. has presented considerable expert opinion that the coercive aspect of tender offers is illusory and that tender offers generally should be favored because they reallocate corporate assets into the hands of management who can use them most efficiently. This argument was addressed by the Supreme Court in *CTS* and, although the majority apparently disagreed with it,[5] nevertheless the court pointed out that "[T]he Constitution does not require the States to subscribe to any particular economic theory. We are not inclined 'to

---

4. *See* footnote at p. 2643, *Edgar v. MITE*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

5. "In our view, the possibility of coercion in some takeover bids offers additional justifica-

tion for Indiana's decision to promote the autonomy of independent shareholders." *CTS*, 107 S.Ct. at 1651.

second guess the empirical judgments of law makers concerning the utility of legislation ...' " [citation omitted] *CTS* at 1651.

Finally, although the Ohio Act also differs from the Indiana Act in that the Ohio Act has no provision limiting its application to those domestic corporations with a particular number of shareholders resident in Ohio, this Court finds that such a provision is not essential to prevent the statute from creating an impermissible burden on interstate commerce. As the *CTS* court pointed out, a state has no interest in protecting non-resident shareholders of non-resident corporations. However the Ohio Act applies only to domestic corporations which have their principal place of business, principal executive offices or substantial assets in Ohio, and Ohio has, as did Indiana, a definite interest in providing protections for the shareholders of its domestic corporations.

Therefore, this court finds that plaintiffs have not demonstrated that the Ohio Act is likely to be found to be unconstitutional because it violates the Commerce Clause.

Having concluded that plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their case, *i.e.,* a substantial likelihood that the Ohio Act will be found to be unconstitutional, either because it is pre-empted by the Williams Act or because it violates the Commerce Clause, it is not necessary to proceed to an analysis of the harm alleged by plaintiff if the Ohio Act is enforced, the harm to others if the Ohio Act is not enforced, or the question of the public interest. Suffice it to say, if the Ohio Statute is not unconstitutional, then harm to the plaintiff resulting from its enforcement is immaterial. Finally, unless the plaintiff has met his burden of demonstrating a substantial likelihood that the statute would be found to be unconstitutional, then even though this court believes, as did Justice Scalia his concurring opinion in *CTS,* that the benefit to the shareholders as opposed to the benefit to management which results from the legislation is at best debatable, the public interest cannot be well served by the court's undertaking to func-

tion as a third house of the state legislature and proceeding, on the basis of one economic theory or another, to enjoin enforcement of that law.

Accordingly, the motion for a preliminary injunction enjoining the enforcement of O.R.C. § 1701.831 is denied.