RP ACQUISITION CORPORATION, Plaintiff,

v.

STALEY CONTINENTAL, INC.; Charles M. Oberly, III, Attorney General, State of Delaware and Michael E. Harkins, Secretary of State of Delaware, Defendants.

Civ. A. No. 88–190–JRR.

United States District Court, D. Delaware.

May 9, 1988.

Steven D. Goldberg, of Theisen, Lank, Mulford & Goldberg, Wilmington, Del., for plaintiff.

Charles S. Crompton, Jr., Peter M. Sieglaff, Gregory A. Inskip, and Steven C. Norman, of Potter, Anderson & Corroon, Wilmington, Del., for defendant Staley Continental, Inc.

Grover C. Brown, Edward M. McNally, and Mary M. Johnston, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendants Oberly and Harkins.

Daniel L. Goelzer, Jacob H. Stillman, Eric Summergrad, and Rada L. Potts, Washington, D.C., for the S.E.C., amicus curiae, Paul Gonson, Solicitor, of counsel.

## OPINION

ROTH, District Judge.

In *BNS Inc. v. Koppers Company, Inc.,* 683 F.Supp. 458 (D.Del.1988), this Court confronted the question of whether the recently enacted Delaware Business Combinations statute, Del. Code Ann. tit. 8, § 203 (1988), violated the Supremacy or Com-

merce Clauses of the United States Constitution. On a meager evidentiary record, Judge Schwartz declined to rule that the statute was most likely unconstitutional. He refused to issue a preliminary injunction based either on Section 203's alleged unconstitutionality or on other grounds. In the action now before us, we are presented solely with a challenge to the constitutionality of Section 203. While plaintiff here has buttressed its argument with additional statistical evidence, we once again find that the facts adduced are insufficient to support a determination that Section 203 is most likely unconstitutional. We, therefore, deny plaintiff's Motion for a Preliminary Injunction.

## I. FACTS.

RP Acquisition Corporation ("RP"), a Delaware corporation, is an indirect wholly owned subsidiary of Tate & Lyle PLC ("Tate & Lyle"), an English corporation. Tate & Lyle, based in London, is primarily engaged in the sweetener industry, especially sugar production and refining. Staley Continental, Inc. ("Staley"), a Delaware corporation based in Illinois, also participates in the sweetener industry, although it in addition has a substantial food service arm.

On April 8, 1988, RP launched the current tender offer for any or all of Staley's outstanding (i) common stock (and its associated preferred stock purchase rights), (ii) $3.50 depositary preferred shares, and (iii) $3.75 cumulative preference stock (the "preference shares"). Only the common stock bears voting rights. RP amended the offer on April 29, 1988 to raise the amount offered for the common stock. The common stock had traded in 1987 between a low of 16⅞ and a high of 32; RP currently offers $35 per share. For the depositary preferred shares, which had traded in 1987 between a low of 37½ and a high of 54¼, RP currently offers $53.15 per share. For the preference shares, for which market information is not available, RP currently offers $105 per share. The offer expires on May 10, 1988.

If RP acquires control of Staley, it plans to merge Staley into the operations of Tate & Lyle. In addition, RP plans to sell the food service business of Staley. Under the terms of the anticipated merger, each Staley common share would be converted into the right to receive the same cash price paid pursuant to the tender offer; each preference share would be converted into the right to receive $105 per share (the same as the current tender offer price) plus dividends accrued but unpaid at the time of the effective date of the merger; depositary preferred shares would remain outstanding but each depositary preferred share could, at the option of the holder, be converted into the amount of cash the holder would have received had the holder converted the shares into common immediately prior to the effective date of the merger.

RP conditions its tender offer on, *inter alia*, "the purchaser being satisfied that the restrictions on business combinations contained in Section 203 of the Delaware General Corporation Law are invalid or inapplicable to the proposed merger ... as a result of action by [Staley's] board of directors, the acquisition of a sufficient number of common shares, judicial action or otherwise." Plaintiff here seeks such "judicial action."

In its effort to take over Staley, RP also faces a panoply of defensive stratagems which Staley has put in place to deter a hostile acquisition. These tactics are currently under review by the Delaware Chancery Court.

In response to the RP takeover bid, Staley's Board of Directors met on April 20, 1988. The Board decided to recommend to Staley common shareholders that they reject the then $32 offer and refuse to tender their shares. The Board deemed the offer inadequate and not in the best interests of Staley. Aside from drawing on its own business acumen, the Board arrived at this conclusion upon considering (1) the written opinions of First Boston Corporation and Merrill Lynch Capital Markets, financial advisors to Staley, that the offer is financially inadequate; (2) the Board's own determination that an alternative transaction

more beneficial to Staley stockholders could be arranged; (3) the history of Staley common's trading price; and (4) the fact that the current market price of the common stock exceeded the tender offer price set by RP. In view of the fact that the offer is conditioned upon receipt of sufficient common stock and the Board has recommended that common not be tendered, the Board took no position on RP's offer to buy depositary preferred shares and preference shares.

## II. STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION.

Plaintiff is presently before the Court on its motion for a preliminary injunction. In order to succeed on such a motion, plaintiff must establish:

(1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4) the public interest. *Constructors Ass'n of Western Penna. v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978); *Delaware River Port Auth. v. Transamerica Trailer Transp., Inc.,* 501 F.2d 917, 919–20 (3d Cir.1974).

*Kennecott Corp. v. Smith,* 637 F.2d 181, 187 (3d Cir.1980).

Staley, in addition to arguing that Section 203 is constitutional, opposes a preliminary injunction on the ground that no irreparable injury is threatened. Staley contends that various other conditions which RP has placed upon the closing of its tender offer will not be accomplished so that the offer will fail. Included among the obstacles to completing the offer are the Staley Benefit Trust Agreement, the supermajority vote required in the Staley certificate of incorporation before a merger can be approved, and the Flip–In and Flip–Over Rights Agreement, which affects the Staley common stock. RP is presently seeking an injunction in the Delaware Court of Chancery to prevent the operation of these anti-takeover devices. Staley contends that the RP offer will not succeed because one or more of these three deterrents to the takeover will not be removed and for that reason RP will not close its tender offer.

A decision is expected from the Court of Chancery within the next day or two. However, whatever that decision may be, it still may not be immediately apparent whether full, partial or no success in the Chancery action will in and of itself cause RP not to close its offer. Due to the proximity of the takedown date and our inability at this time to determine whether the benefit trust/supermajority/rights agreement conditions will prevent the threat of irreparable harm even if we do not issue a preliminary injunction (because the tendered stock may not be accepted by RP if one or more of these conditions are not lifted), we will go on to analyze whether the other requirements of a preliminary injunction exist here. We will first look at the question of the reasonable probability that RP will convince the Court that Section 203 is unconstitutional.

## III. LEGAL ANALYSIS.

### A. *Application of Section 203.*

In the nomenclature of the Delaware statute, RP, once its Staley common holdings reach 15 percent, is an "interested stockholder." § 203(c)(5). As such, RP is restricted from effecting certain "business combinations" involving Staley for a period of three years. § 203(a), (c)(3). Specifically, RP cannot effect the merger of Staley. § 203(a), (c)(3)(i).

Various exceptions to this rule exist. § 203(a), (b). However, only two exceptions avail the hostile acquiror.[1] First, the restriction falls if the interested stockholder acquires at least 85 percent of the outstanding voting stock of the corporation (excluding shares owned by director-officers and certain employee stock ownership (ESOPs)) in the same transaction in which it becomes an interested stockholder (the

---

1. Unless the target corporation has in some way opted out of § 203. See § 203(b)(1)–(3). Other exceptions exist, none of which apply here. § 203(b)(4)–(6).

"85 percent exception"). § 203(a)(2). Second, the restriction falls if the interested stockholder's proposed business transaction is approved at the time of or subsequent to the combination by the board of directors and authorized by an affirmative vote conducted at a shareholders' meeting of at least 66⅔ percent of the outstanding voting stock that is not owned by the interested stockholder.

Plaintiff claims that in practice these exceptions are illusory and that the Delaware statute will deter hostile takeovers. This restriction on "business combinations," plaintiff further argues, violates the Supremacy and Commerce Clauses of the Constitution.

### B. *The Supremacy Clause.*

Article VI, Clause 2 of the Constitution, the Supremacy Clause, commands:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Supreme Court has ruled that the Supremacy Clause bars not only state laws that are literally inconsistent with federal law [2] but also state laws that contravene "the full purposes and objectives" of Congressional enactments. *CTS Corp. v. Dynamics Corp. America,* — U.S. —, 107 S.Ct. 1637, 1644, 95 L.Ed.2d 67 (citations omitted).

Plaintiff argues that Section 203 contravenes the full purposes and objectives of the Williams Act, 15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f). Accordingly, we must essay those purposes and objectives.

Enacted in 1968, the Williams Act filled a regulatory gap of the Securities Act of 1933 and the Exchange Act of 1934. While the latter two acts required a variety of financial disclosures for initial public offerings and for the trade of securities on secondary markets, they did not regulate the cash tender offer. After a spate of cash tender offers in the mid 1960s, the Williams Act was passed to ensure that tender offerees be afforded sufficient information to allow them to make an intelligent business decision whether or not to tender their shares. Under its terms, the tender offeror, such as RP, must disclose, *inter alia,* its background and identity, the source and amount of funds or other consideration to be drawn upon in making its purchases, the extent of its holdings in the target company, and its plans with respect to the target corporation's business or corporate structure. 15 U.S.C. § 78n(d)(1) (incorporating § 78m(d)(1) by reference); 17 C.F.R. § 240.14d-6 (1987).

In addition to these disclosure requirements, the Williams Act expanded the rights of tendering shareholders. First, a tendering shareholder may withdraw his shares during the time the offer remains open. 15 U.S.C. § 78n(d)(5); 17 C.F.R. § 240.14d-7(a) (1987). Second, if more shares are tendered than the offeror sought to purchase, purchases must be made on a pro rata basis from each tendering shareholder. 15 U.S.C. 78n(d)(6); 17 C.F.R. § 240.14d-8 (1987). Third, if during the course of the offer the amount paid for the target shares is increased, all tendering shareholders are to receive the additional consideration, despite the fact they were willing to tender their shares at a lower price. 15 U.S.C. § 78n(d)(7).

Contemporary congressional statements elucidated and subsequent judicial decisions confirmed the Williams Act's paramount purpose: shareholder protection. The bill's sponsor, Senator Harrison Williams, stated at its introduction on the Senate floor:

> This legislation will close a significant gap in *investor protection* under the Federal securities laws by requiring the disclosure of pertinent information *to*

---

**2.** We do not need to analyze here whether Section 203 is "literally inconsistent" with the Williams Act since Judge Schwartz in *BNS, Inc.*

*v. Koppers Company, Inc.,* at 460, has already ruled that Section 203 passed this primary hurdle.

*stockholders* when persons seek to obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities.

113 Cong.Rec. 854 (1967) (emphasis supplied) *quoted in Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 942, 51 L.Ed.2d 124 (1977). In the words of Chief Justice Burger, the "legislative history ... shows that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Piper*, 430 U.S. at 35, 97 S.Ct. at 946.

In achieving this primary goal of protecting shareholders, Congress did not intend to side in the contest between the offeror and the target's management. As Senator Williams commented:

> Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders while at the same time providing the offeror and management equal opportunity to fairly present their case.

113 Cong.Rec. 854–55 (1967). The Supreme Court also has noted that in passing the Williams Act "Congress was indeed committed to a policy of neutrality in contests for control." *Piper*, 430 U.S. 1, 29, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977). However, the Court at the same time observed that this policy of offeror-management neutrality was subservient to the Williams Act purpose of shareholder protection. *Id.* at 30–31, 97 S.Ct. at 943–44.

Given that the Williams Act is itself silent on the issue of the preemption of state takeover laws, *Edgar v. MITE Corp.*, 457 U.S. 624, 631 n. 6, 102 S.Ct. 2629, 2634–35 n. 6, 73 L.Ed.2d 269 (1982), this Court must now decide whether Section 203 substantially frustrates the Williams Act purpose of shareholder protection in the tender offer arena, and in so doing we must consider to some extent how far this "purpose" may go beyond the regulation of a specific tender offer, as it occurs.

We will first define the standard to be applied in making this decision. In *Edgar v. MITE Corporation*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), a plurality opinion authored by Justice White gave vigorous and broad preemptive effect to the Williams Act's policy of offeror-management neutrality. *Id.* at Parts III–IV. For Justice White, it was "crystal clear that a major aspect of the [Williams Act's] effort to protect the investor was to avoid favoring either management or the takeover bidder." *Id.* at 633, 102 S.Ct. at 2636. In his view, the policy of neutrality went beyond the process of disclosure itself:

> Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice.... Congress intended to strike a balance between the investor, management, and the takeover bidder. The bidder was to furnish the investor and the target company with adequate information but there was no "inten[tion] to do ... more than give incumbent management an opportunity to express and explain its position." *Rondeau v. Mosinee Paper Corp.*, [422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975)]. Once that opportunity was extended, Congress anticipated that the investor, if he so chose, and the takeover bidder should be free to move forward within the time frame provided by Congress.

*Id.* at 634, 102 S.Ct. at 2636. Applying this vision of the Williams Act, the plurality deemed the Illinois statute violated the Supremacy Clause. The statute had (1) required that the offeror register with the Illinois Secretary of State twenty business days before its offer became effective, during which time the offeror could not, but management could, communicate with the shareholders and (2) provided for substantive review of the offer by the Illinois Secretary of State, who could deny registration of the offer if he/she found it inequitable. The plurality viewed these sections constitutionally offensive.

In *CTS Corp. v. Dynamics Corp. of America,* —— U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), the Court again analyzed a takeover statute under Supremacy Clause–Williams Act attack. The Court did not take this opportunity to definitively establish the preemptive effect of the Williams Act's policy of neutrality and the resulting perimeters of state regulation of takeovers. It did not decide, for example, whether a state, in the name of shareholder protection, could bar hostile takeovers without violating the Supremacy Clause. Instead, the Court applied, for the sake of argument, what it characterized as "the broad interpretation of the Williams Act articulated by Justice White in *MITE*." *CTS,* 107 S.Ct. at 1645. The Court chose this path of analysis since it ultimately concluded the Indiana statute passed constitutional muster even under the *MITE* plurality standard. *Id.* We too follow this analytical path as we conclude that Section 203 survives application of *MITE*'s standards. Having established this, we need not explore what narrower standard the *CTS* court might have approved.

We are first instructed by the application of *MITE* in *CTS* itself. The Indiana law, Ind. Code Ann. § 23–1–42 (Burns Supp. 1986), deprived an acquiror of its voting rights in the shares it had purchased unless and until a majority of the pre-existing disinterested shareholders (*i.e.,* shareholders other than the acquiror and the target corporation's officers or inside directors, § 23–1–42–3; *CTS,* 107 S.Ct. at 1641, n. 2) voted to enfranchise the acquiror. § 23–1–42–9. In upholding the constitutionality of the law, the Court observed that the Indiana statute helped ameliorate the condition of a shareholder faced with a two-tier coercive tender offer. *CTS,* 107 S.Ct. at 1646. In that situation, an offeror bids to purchase shares sufficient, when added to its previous holding, to own 51 percent of the target corporation and thus exercise control. This bid is usually in cash. Simultaneously, the offeror promises to merge the target corporation and thus "freeze out" the remaining 49 percent shareholders once it gains control, forcing the minority to surrender shares for consideration. Cf. Del.Code tit. 8, § 251 (law of the merger of Delaware corporations). This consideration, usually in the form of securities, is less than the tender offer price. Accordingly, a shareholder will tender shares, even if he or she believes the tender offer price is low, out of fear others will tender their shares and give the offeror control. The shareholder will then receive only the "freeze out" consideration, less than the low tender offer price. *See, e.g., Unocal Corp. v. Mesa Petroleum Corp.,* 493 A.2d 946 (Del.1985); *see also CTS,* 107 S.Ct. at 1646. A logical result is that all stockholders tender their shares and then receive a 51–49 percent blend of the cash offer and the securities "freeze out" consideration, the blend price being less than the low tender offer price but more than the "freeze out" consideration. The Indiana statute works to cure this problem by empowering the disinterested shareholders to collectively decide, by means of their vote to enfranchise the acquiror, whether the acquiror will be allowed to exercise control. In ruling in favor of the Indiana law, the *CTS* court accepted that states, in promoting shareholder protection, an aim consistent with the Williams Act, can to some extent at least affect the offeror-management neutrality which the Williams Act proclaims. In other words, states, to protect shareholders, can deter hostile tender offers, especially those that threaten to culminate in two-tier coercive takeovers.

How far then can the tender offer playing field be tilted by a state in favor of the offeror or of management without running into Williams Act preemption.[3] *See Veere,*

---

**3.** We also observe that if the purpose of the Williams Act, the protection of the shareholder, is read to include not only protection from secretive offerors but also protection from slothful management, then eradication of hostile takeovers would undercut that purpose. The possibility of a hostile takeover spurs management to run the corporation efficiently and profitably while a management immune from hostile takeovers courts a management of sloth. *See MITE,* 457 U.S. at 643, 102 S.Ct. at 2641; *Piper,* 430 U.S. at 30, 97 S.Ct. at 943–44; S.Rep. No. 550, 90th Cong., 1st Sess., 3 (1967). Eradication would also undercut the putative right of

*Inc. v. The Firestone Tire & Rubber Co.,* 685 F.Supp. 1027, 1029–30 (N.D.Ohio 1988). C. Smith & C. Furlow, *Guide to the Takeover Law of Delaware* 134 (Corporate Practice Series 1988). Certainly, at the least, we can distill from the Supreme Court's application of *MITE* in *CTS* the principle Chief Judge Schwartz enunciated in *BNS:* state statutes that protect the shareholder but which also have "substantial deterrent effects on tender offers do not circumvent Williams Act goals, so long as hostile offers [that] are beneficial to target shareholders have a meaningful opportunity for success." At 469.

■ In the context of the additional facts now before the Court in this case, we will, therefore, apply once again to the Delaware statute this standard, which was set out in *BNS.*

First of all, Section 203 helps protect independent shareholders. By making post-acquisition mergers more difficult, Section 203 discourages potential makers of two tier coercive offers from launching such bids. It also discourages potential makers of "any and all" offers calculated to achieve a 51 percent tender and to be followed by a freeze-out. In addition, making these mergers more difficult hampers leveraged buyouts, whereby the target corporation is saddled with the debt the acquiror has incurred in taking control.

Of course, at the same time that Section 203 achieves shareholder protection, it also exercises substantial deterrent effects on tender offers. Section 203 can deprive an acquiror of what it may consider an essential element of control of the target corporation, the ability to effect a business combination. For example, the acquiror may no longer be able to realize quickly the possible synergy resulting from the merger and integration of the target corporation into itself. Highly leveraged offerors may find their borrowed funds harder to obtain since lenders may hesitate to loan funds

knowing that they will have to wait three years for repayment, increasing carrying costs and risk. The making of tender offers may thus be generally dampened. The deterrence of Section 203 inhibits not only coercive offers but also any-or-all bids such as RP's.

The crucial inquiry, then, is whether hostile offers still have a meaningful opportunity for success despite the operation of Section 203. The defendants maintain the exceptions to Section 203 do preserve such an opportunity for success. Plaintiff asserts these exceptions are illusory.

The 85 percent exception is illusory, according to the plaintiff, because (1) hostile offers have historically failed to achieve that percentage of ownership and (2) typically, at least 16 percent of the stock is in the hands of shareholders who are blindly pro-management and/or shareholders who are entirely non-responsive to any corporate communication (the "dead shares"). In support of the former proposition, the plaintiff proffers the affidavit of Dr. Gregg A. Jarrell, former Chief Economist for the Securities and Exchange Commission. D.I. 12 ("Jarrell Affidavit"). Dr. Jarrell has studied the results of 29 successful "hostile" tender offers which occurred over the last seven years. For Dr. Jarrell's purposes, hostile tender offers are those "offers in which no merger agreement is ultimately negotiated between bidder and target." *Id.* at ¶ 18. His conclusion: 55 percent (16 out of 29) of the hostile tender offers reached 85 percent share holdings. *Id.* at ¶ 14(i). In its *amicus curiae* submission, the S.E.C. defines hostile tender offers as those offers to which management never acquiesces. D.I. 24 at 29–30 ("S.E.C. Brief"). Interpreting the same information as Dr. Jarrell did, the S.E.C. concludes at most 50 percent (13 out of 26) of the hostile tender offers reached 85 percent share holdings. *Id.*[4] These percentages undercut plaintiff's own argument and indicate

shareholders to receive as many legal tender offers as possible.

**4.** The S.E.C. concentrates on the eight hostile offers which began and ended between 1985 and 1987, characterizes three as friendly, and

then concludes 60 percent (3 out of 5) of the hostile tender offers failed to reach 85 percent share holdings. In and of itself we find this statistic based on too small a sampling to be relevant.

hostile offers will have a "meaningful opportunity for success" under the 85 percent exception.[5]

More importantly, we find this historical record not persuasive for present purposes. First, Jarrell's statistics refer to 85 percent ownership of all stock. Section 203, however, refers to 85 percent of all stock less stock owned by, *inter alia*, officer-directors, those least likely to tender to a hostile offeror. Accordingly, these statistics overstate the difficulty of reaching 85 percent ownership. Second, levels of ownership which offerors achieved in the past are not an accurate prognosticator of the levels of ownership offerors will reach when faced with Section 203. Before passage of the Delaware law, offerors had no specific incentive to reach 85 percent ownership.[6] Now, they may extend the duration of the offer to reach 85 percent ownership. Alternatively, they may offer more consideration to reach 85 percent in which case shareholders would benefit, receiving greater consideration for the control premium they are collectively surrendering. On the other hand, management may try to place 15 percent of the outstanding stock in steadfastly loyal (but not excluded) hands, eliminating the possibility of a successful hostile tender offer. But until an accurate, rather than hypothetical, record can be assembled, whether the 85 percent exception "will permit a sufficient number of hostile-to-the-end offers," as Chief Judge Schwartz commented in *BNS*, is an issue "which remains to be seen." *BNS*, at 471.

We also find unpersuasive plaintiff's evidence on the amount of stock in the hands of shareholders who are blindly pro-management or who are entirely non-responsive to all corporate communication. Dr. Jarrell cites a study indicating that the average Fortune 500 company has 9.45 percent of its stock in the hands of officers and/or directors and cites other studies indicating between 11 percent and 21.2 percent officer and/or director ownership for smaller corporations. Jarrell Affidavit at ¶¶ 27, 29. Under Section 203(a)(2) however, shares owned by officer-directors and certain ESOPs are excluded from the base of the 85 percent calculation. Plaintiff has been unable to parse the management holdings listed above and distinguish holdings included in the base of the 85 percent calculation from those excluded. Rather, plaintiff simply surmises that "some of the stock will be excluded from the calculation of the 85 percent threshold." Plaintiff Opening Brief, D.I. 14, at 17.[7] That is an inadequate factual foundation for a ruling that Section 203 is most likely unconstitutional under the Supremacy Clause.[8]

**5.** We note these further statistics. If two-tier tender offers are excluded from the count as offers that are inherently not beneficial to target shareholders, 64 percent (16 out of 25) of hostile tender offers reached 85 percent share holdings (59 percent (13 out of 22) using S.E.C. figures). If tender offers that did not result in a 50+ percent holding of the offeror are also excluded from this count as offers that a majority of shareholders did not view as advantageous, 73 percent (16 out of 22) of hostile tender offers reached 85 percent share holdings (68 percent (13 out of 19) using S.E.C. figures).

**6.** Similarly, while the S.E.C. contends that the list of 29 hostile tender offers should not include offers in which offerors had holdings prior to the tender offer of 15 percent or more of the target corporation's voting stock, before passage of Section 203 offerors did not suffer the disincentive to own 15 percent or more of target corporation's voting stock and thus trigger Section 203's definition of an "interested stockholder" and its requirement that 85 percent ownership be achieved in the same transaction in which the offeror became an interested share-

holder. We further note that of the eight hostile tender offers the S.E.C. apparently would exclude from the list of 29, three failed and five succeeded to reach 85 percent ownership. Therefore, their exclusion would have little statistical impact.

**7.** One study of Fortune 500 firms indicates the two top officers own roughly half of all director holdings. The study does not report total director-officer holdings. Affidavit of Edward M. McNally, D.I. 17 ("McNally Affidavit") at Exh. 7, pp. 2–3 (letter from Joseph A. Grundfest to David B. Brown (Dec. 22, 1987)).

**8.** Plaintiff also claims that shareholders steadfastly loyal to Staley management but not excluded from the 85 percent calculation control 15 percent of Staley common stock. Jarrell Affidavit at ¶¶ 21–24. Factually, we find this count inflated. It includes a 5 percent holding of a corporation, the chairman of which sits on Staley's board, and a 4.4 percent holding of a trust, a beneficiary of which sits on Staley's board. The corporation, to its shareholders,

As for plaintiff's evidence on dead shares, Dr. Jarrell, studying 412 successful tender offers which occurred over the last seven years, concludes an average of 12.4 percent of outstanding shares did not respond to the tender offer. Jarrell Affidavit at ¶ 26. These 412 offers, however, include 29 hostile and 58 two-tier offers to which shareholders might well refuse to tender for legitimate reasons. Referring to 344 successful "any and all" tender offers, Dr. Jarrell finds an average of 9.7 percent of outstanding shares did not respond. *Id.* Aside from the fact that these 344 offers include 25 hostile ones, this statistic again may merely indicate that some shareholders, even despite the advice of management otherwise, have made an informed decision not to tender their shares, regardless of how unintelligent or cantankerous this may appear to others. While truly dead shares apparently do exist, we find plaintiff's statistics probably overestimate their existence. It is a distinct possibility that, should offerors increase their bids in an effort to reach 85 percent ownership, dead shares will be wondrously resuscitated. We also note that when Section 203 was being developed, S.E.C. Commissioner Joseph A. Grundfest wrote the Corporation Law Section of the Delaware State Bar Association and calculated dead shares to be "a minimum of 3 percent and more commonly about 5% of the shares," these numbers being "consistent with the generally accepted five percent estimate." McNally Affidavit at Exh. 6, p. 7 (letter from Joseph A. Grundfest to David B. Brown (Dec. 18, 1987)). In short, we find that, despite the existence of dead shares, hostile tender offers retain a meaningful opportunity for success under the 85 percent exception.

Having made this finding, we further note that the Council of the Corporation Law Section of the Delaware State Bar Association (the "Section"), which drafted Section 203, and the Delaware General Assembly studied the 85 percent exception thoroughly and intently. As the exception was originally drafted, only interested stockholders holding 90 percent of all outstanding stock (without any exception for management controlled shares) could effect a business combination. McNally Affidavit at Exh. 2, p. 1 (Section Draft of Nov. 19, 1987). Concerned that this 90 percent exception was too high a figure, S.E.C. Commissioner Grundfest wrote to the Section and suggested the percentage be lowered, and offered two methods to accomplish such:

> First[,] the threshold can be lowered from 90 percent to 75 percent or some other realistic figure.... Second, the approval percentage can be expressed as a percentage of shares tendered by disinterested stockholders. A combination of the two approaches may also be better than either alone.

McNally Aff. at Exh. 5, pp. 8–9 (letter from Joseph A. Grundfest to David B. Brown (Dec. 10, 1987)).[9] These suggestions were eventually adopted—the percentage level was lowered from 90 percent to 85 percent while at the same time officer-directors and certain ESOP shares were excluded. § 203(a)(2).[10] Throughout the genesis of Section 203, the 85 percent exception was debated with heat. *See, e.g.,* McNally Affidavit at Exh. 4, pp. R8–R9 (*Goldman & McNally, The Proposed Delaware Takeover Statute: A Report to the Delaware General Assembly* (undated)) (discussing lowering percentage to 80 percent) ("Goldman & McNally"); p. R58 (letter from M. Lipton to clients) (Nov. 23, 1987)) (suggest-

---

and the trustee, to its beneficiaries, each have fiduciary obligations which preclude unflinching loyalty. Legally, the standard we apply today accepts that some takeovers that would have succeeded before the passage of Section 203 now fail. The constitutionality of the Delaware law does not, however, stand or fall based on its application to any one corporation, however idiosyncratic, but rather turns on its universal application.

**9.** Commissioner Grundfest also stated that even if these changes were adopted, he would still oppose the bill. *Id.* at 9, n. 20.

**10.** In addition, the definition of "interested stockholders" was changed from a holder of 10 percent of the outstanding voting stock to a holder of 15 percent. *Compare* McNally Affidavit at Exh. 2, p. 8 (Section draft of Nov. 19, 1987) *with* § 203(c)(5).

ing original 90 percent provision was a "barn-door size exception"); pp. R84–R87 (letter from Joseph A. Grundfest to E. Norman Veasey (Dec. 31, 1987)) (suggesting 75 percent and further share exclusions). This debate took place within the broader context of whether Section 203 violated the Supremacy Clause, the very issue now before the Court. *See, e.g.,* Goldman & McNally at R12–R14. During the course of its deliberations on these issues, the General Assembly considered the views of many individuals including Dr. Jarrell, plaintiff's affiant. *Hearing [on Section 203] Before The House and Senate Judiciary Committees of the Delaware General Assembly,* Tape # 1, pp. 85–104 (Jan. 20, 1988). Certainly, Section 203 can be characterized as a good faith effort by the General Assembly to comply with the Constitution and specifically with the *CTS* decision. Given our independent analysis of the 85 percent exception, we discern no reason to disturb the balance the General Assembly struck.

Having ruled that on the present record the 85 percent exception survives constitutional attack, we need not rule on the other exceptions listed in Section 203, notably the exception for a business combination that is approved at the time of or subsequent to the combination by the board of directors and by 66⅔ percent of the outstanding voting stock that is not owned by the interested stockholder. Subsequent experience may demonstrate that this exception does or does not foster a meaningful opportunity for the success of tender offers beneficial to shareholders.

In concluding our analysis of Section 203 under the Supremacy Code, a comparison of the Delaware law and the Illinois and Indiana laws, reviewed in *MITE* and *CTS* respectively, is instructive. Unlike the Illinois law, Section 203 does not disrupt communication between the offeror and shareholders, striking values at the core of the Williams Act, *cf. Hyde Park Partners, L.P. v. Connolly,* 839 F.2d 837, 850 (1st Cir. 1988); it does not allow management to "'stymie indefinitely a take-over,'" *MITE,* 457 U.S. at 637, 102 S.Ct. at 2638 quoting *MITE Corp. v. Dixon,* 633 F.2d 486, 494 (7th Cir.1980); and it does not interpose the state between the offeror and shareholder as an arbiter of fairness. The Delaware statute, then, contrasts favorably to the Illinois statute that the *MITE* plurality disapproved. The comparison between Section 203 and the Indiana statute is more complex. On the one hand, under Indiana law, a majority of pre-existing disinterested shareholders decide, by means of their vote to enfranchise the acquiror, whether a merger can eventually be consummated;[11] under Delaware law, a super-majority of shareholders make, by means of their tender of shares to the offeror, the same decision.[12] In this respect, the Delaware statute more fully reins the power of acquirors and more tightly circumscribes the choice of individual shareholders in comparison to the Indiana statute. On the other hand, the Indiana acquiror who loses the enfranchisement election is bereft of its vote and in effect becomes an alien in the corporate democracy, its shares subject to redemption by the target corporation, Ind. Code Ann. § 23–1–42–10(b) (Burns Supp. 1986), while the Delaware acquiror who does not meet the 85 percent exception still can exercise its vote, can determine membership on the board of directors, can run the corporation, and is, therefore, a full citizen of the corporate democracy but for its inability to effect a "business combination." In balance, while the two laws are quite dissimilar, both the Indiana statute,

11. *But see* Ind. Code Ann. § 23–1–43 (Burns Supp.1986) (Indiana Business Combination Statute).

12. The super-majority is between a rough minimum of 70.1 percent and maximum of 85 percent of the disinterested shareholders (as statutorily defined), depending on the amount of shares the offeror owned before launching its bid. The 70.1 percent figure may be somewhat high because the less than 15 percent holding the offeror can hold before launching its bid (and later use to reach the 85 percent goal) is measured against all outstanding stock. That percentage holding increases, of course, when it is measured against all outstanding stock less interested shares and, therefore, the percentage of tendered disinterested stock needed by the offeror to reach 85 percent decreases.

approved by the Supreme Court in *CTS,* and the Delaware statute protect the shareholder. While they deter tender offers, the Supreme Court has determined that the Indiana statute preserves a meaningful opportunity for success for those hostile offers that are beneficial to (target) shareholders. From the record before us, we come to the same conclusion with regard to the Delaware statute.

Finally, we note the closing observation of the Supreme Court's Williams Act preemption analysis in *CTS:*

> [T]he Williams Act would pre-empt a variety of state corporate laws of hitherto unquestioned validity if it were construed to pre-empt any state statute that may limit or delay the free exercise of power after a successful tender offer. State corporate laws commonly permit corporations to stagger the terms of their directors. See Model Business Corp. Act § 37 (1969 draft) in 3 Model Business Corp. Act Ann. (2d ed. 1971) (hereinafter MBCA); American Bar Foundation, Revised Model Business Corp. Act § 8.06 (1984 draft) (1985) (hereinafter RMBCA). [*See, e.g.,* Del. Code. Ann. tit. 8, § 141(d) (1983) ]. By staggering the terms of directors, and thus having annual elections for only one class of directors each year, corporations may delay the time when a successful offeror gains control of the board of directors. Similarly, state corporation laws commonly provide for cumulative voting. See MBCA § 33, par. 4; RMBCA § 7.28. [*See, e.g.,* Del. Code. Ann. tit. 8, § 214 (1983) ]. By enabling minority shareholders to assure themselves of representation in each class of directors, cumulative voting provisions can delay further the ability of offerors to gain untrammeled authority over the affairs of the target corporation. See Hochman & Folger, Deflecting Takeovers: Charter and By-Law Techniques, 34 Bus. Law. 537, 538–539 (1979)....
>
> The longstanding prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all state laws that delay the acquisition of voting control following a tender offer, it would have said so explicitly.

*CTS,* 107 S.Ct. at 1647–48 (footnotes omitted). The Supreme Court having advised thus that a two year delay before an acquiror obtains "untrammeled authority" endures Supremacy Clause—Williams Act scrutiny, we are pressed to understand plaintiff's claim of the sudden unconstitutionality of the three year delay which Section 203 imposes on "business combinations."

To conclude, we find the plaintiff has not borne its burden of proof and has not shown Section 203 to be most likely unconstitutional because preempted by the Williams Act.

### C. *The Commerce Clause.*

While *CTS* did not fully map the contours of Supremacy Clause—Williams Act analysis, the opinion clearly chartered the intersection of the Commerce Clause and State corporation law. Our decision tracks the Court's analysis.[13]

■ Article I, Section 8, Clause 3 of the Constitution empowers Congress to "regulate Commerce ... among the several States." Of course, the Commerce Clause has long been interpreted to be not only a positive grant of power to Congress but also a negative restriction of power on the States. *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852). State statutory violations of this negative restriction, the dormant Commerce Clause, are currently evaluated under three tests. First, does the law discriminate against interstate commerce? *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Second, does the law subject interstate activities to inconsistent regulations and thereby affect interstate commerce? *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). Third, does the law place a

---

**13.** Finding the *CTS* commerce clause analysis determinative, we do not address the parties' arguments on *Norfolk Southern Corp. v. Oberly,* 822 F.2d 388 (3d Cir.1987), which reviewed Commerce Clause precedent in a very different factual context.

burden on interstate commerce clearly excessive when compared to its putative local benefits? *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). We administer these tests in sequence.

■ Section 203 does not discriminate against interstate commerce. It does not favor Delawarean offerors at the expense of non-Delawarean offerors. *CTS*, 107 S.Ct. at 1648–49. Nor, for that matter, does it favor Delawarean shareholders at the expense of non-Delawarean shareholders. The first test is passed.

Section 203 does not subject interstate activities to inconsistent regulations. It is a Delaware law regulating only Delaware corporations. "So long as each State regulates voting rights [or business combinations] only in corporations it has created, each corporation will be subject to the law of only one State." *CTS*, 107 S.Ct. at 1649. The second test is passed.

Whether the third test, *i.e.*, does the law place a burden on interstate commerce in excess to its local benefits, should even be here administered is a matter of controversy. Analyzing a Massachusetts statute that affected tender offers, the First Circuit commented:

There is ... some support of the view that any Commerce Clause analysis now is, or at least ought to be, complete with the two above-described inquiries, and that the *Pike* balancing test is obsolete. *See, e.g., CTS*, 107 S.Ct. at 1652–53 (Scalia, J., concurring); Langevoort, *Comment—The Supreme Court and the Politics of Corporate Takeovers: A Comment on CTS Corp. v. Dynamics Corp. of America*, 101 Harv.L.Rev. 96, 103–04 (1987); Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation*, 85 Mich.L.Rev. 1865, 1866–68 (1987). The balancing test does seem to

have been abandoned by the *CTS* Court in cases where the state law merely regulates intrastate "corporate governance."

*Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 844 (1st Cir.1988).[14] Nevertheless, the Supreme Court did apply some form of the balancing test in *CTS* or else, as Justice Scalia pointed out, its inquiry would have ceased upon the determinations that the Indiana law did not discriminate against interstate commerce and did not create an impermissible risk of inconsistent regulation. *CTS*, 107 S.Ct. at 1652 (Scalia, J., concurring). We then apply the same balancing test the Supreme Court employed in *CTS*, albeit a deferential and straitened one.

In rendering its decision, the Court admonished the lower court for its failure "to appreciate the significance for Commerce Clause analysis of the fact that state regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." *CTS*, 107 S.Ct. at 1649. While the Court accepted that state laws regulating corporate governance, by "prohibiting certain transactions ... and regulating others, ... necessarily affect certain aspects of interstate commerce," the Court emphasized that it "is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares." *Id.* at 1650. Justice Powell used the law of mergers as a paradigm of traditional state regulation of corporate governance, observing that a "State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs." *Id.* at 1650–51.

---

14. Because the Massachusetts statute reviewed in *Hyde Park* actually barred offers to purchase and purchases of stock, the First Circuit went on to apply the *Pike* balancing test. *Id.* at 844–848. See also *MITE*, 457 U.S. at Part V–B, 102 S.Ct. at Part V–B (finding unconstitutional un-

der Commerce Clause Illinois statute that directly regulated tender offers, including offers for non-Illinois corporations). In contrast, the Delaware statute, like the Indiana statute analyzed in *CTS*, simply regulates intrastate corporate governance.

Turning to the Indiana statute at issue, the Court found the "primary purpose of the Act [was] to protect the shareholders of Indiana corporations." *Id.* at 1651. Since a "change of management may have important effects on the shareholders' interests," the Court explained, it was within the State's role as "overseer of corporate governance" to establish mechanisms to protect those interests. *Id.* at 1651. The Court considered such mechanisms especially prudent in light of "the possibility of coercion in some takeover bids." *Id.*

The Court specifically rejected the contention that the deterrence the Indiana statute exercised on hostile tender offers rendered the law unconstitutional. Refusing to revisit the days of *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), the Court affirmed that the "Constitution does not require the States to subscribe to any particular economic theory." *Id.* 107 S.Ct. at 1651–52.

The *CTS* decision, then, would apparently squarely dispose of plaintiff's Commerce Clause challenge. Undaunted, plaintiff and the S.E.C. attempt to distinguish the instant litigation from the Supreme Court's holding.

First, argues plaintiff, the Indiana statute applied to only Indiana corporations with certain additional Indiana contacts [15] but the Delaware statute applies to all Delaware corporations. This distinction is vital, according to the plaintiff, because it demonstrates more local benefits accrued to Indiana under its statute than accrue to Delaware under Section 203. While it is true that the Supreme court mentioned these additional contacts, their existence

*vel non* is not constitutionally determinative. Rather, Delaware has a substantial, and constitutionally weighty, interest "in preventing the corporate form [which Delaware itself has created] from becoming a shield for unfair business dealing." *CTS,* 107 S.Ct. at 1651–52. In other words, Delaware realizes an important local benefit when it protects the shareholders of Delaware corporations, wheresoever the shareholders reside.

Second, plaintiff and the S.E.C. argue *CTS* is not dispositive on the grounds that the Indiana and Delaware statutes use different mechanisms of corporate governance to protect the shareholder. *See* comparison pp. 485–86, *supra.* The difference is crucial, it is asserted, because Section 203's mechanism, unlike that under the Indiana Code, virtually precludes all hostile tender offers, and thereby burdens interstate commerce in the extreme. However, as we discussed at length above, *supra,* pp. 482–84, plaintiff has failed to prove that Section 203 will have this noxious effect. Even if the law will limit the number of successful tender offers, the Supreme Court has ruled that "this result would not substantially affect our Commerce Clause analysis." *Id.* 107 S.Ct. at 1652.[16]

The third test is passed; Section 203 survives Commerce Clause attack.

## IV. CONCLUSION.

Because we find, therefore, that plaintiff does not have a reasonable probability of eventually succeeding in its claim that Section 203 is unconstitutional, either under the Supremacy Clause or under the Com-

---

**15.** The Act applied to any "issuing public corporation" which was statutorily defined as:

    a corporation that has:
      (1) one hundred (100) or more shareholders;
      (2) its principal place of business, its principal office, or substantial assets within Indiana; and
      (3) either:
      (A) more than ten percent (10%) of its shareholders resident in Indiana;
      (B) more than ten percent (10%) of its shares owned by Indiana residents; or
      (C) ten thousand (10,000) shareholders resident in Indiana.

Ind. Code Ann. § 23–1–42–4(a) (Burns Supp. 1986).

**16.** We find no support in *CTS* for the S.E.C.'s proposal that this Court should enter into an extended analysis of whether Delaware chose the best mechanism for shareholder protection. Pursuant to the instruction of *CTS,* we have determined that the mechanism the Delaware General Assembly did choose, Section 203, does not place a burden on interstate commerce clearly excessive in relation to its local benefits. Our inquiry ceases at that point.

merce Clause, we will deny plaintiff's motion for a preliminary injunction.