**WEST POINT–PEPPERELL, INC.,**
Plaintiff and
Counterclaim–Defendant,

v.

**FARLEY INC., Defendant and**
Counterclaim–Plaintiff,

and

**Trust Company Bank, Defendant.**

**FARLEY INC. and Farley/WPM Acquisition Corp., Counterclaim–Plaintiffs,**

v.

**WEST POINT–PEPPERELL, INC.**
Plaintiff and
Counterclaim–Defendant,

and

**Joseph L. Lanier, Donald J. Keller, W. Cecil Bauer, Henry H. Henley, Jr., Clarence J. Kjorlier, Gerald B. Mitchell, Harry M. Philpott, Yetta G. Samford, Jr., C. McKenzie Taylor and Charles J. Woodruff Additional Counterclaim–Defendants.**

No. 3:88–cv–57–GET.

United States District Court,
N.D. Georgia,
Newnan Division.

Feb. 2, 1989.

King & Spalding, Atlanta, Ga., Willis, McKenzie & Long, LaGrange, Ga., for West Point–Pepperell, Inc.

Bondurant, Mixson & Elmore, Atlanta, Ga., for Farley Inc.

Rogers & Hardin, Atlanta, Ga., for Trust Co. Bank.

## MEMORANDUM DECISION AND ORDER

G. ERNEST TIDWELL, District Judge.

The above-styled matter is presently before the court on Defendant/Counterclaim–Plaintiffs', Farley Inc. and Farley/WPM Acquisition Corp. ("Farley"), motion for a declaration by this court that Article 11A of the Georgia Business Corporation Code, O.C.G.A. §§ 14–2–236 *et seq.* (1988) (the "Anti-takeover statute"), violates either or both the Supremacy and/or the Commerce Clauses of the United States Constitution.

## FACTUAL BACKGROUND

Farley commenced its pending $48 per share tender offer for any and all of the outstanding shares and associated rights of West Point–Pepperell, Inc.'s ("West Point") common stock on October 24, 1988. The offer, as described in Farley's Schedule 14D–1, is conditioned upon: Farley receiving the tender of at least 16,726,604 shares of West Point's common stock (which together with those shares already held by Farley would represent Farley's control of 66⅔% of the outstanding common shares of West Point); the inapplicability, either through judicial order or Board action, of the West Point Rights Agreement; the invalidity or inapplicability of Articles 11 (the "Georgia Fair Price Statute") and 11A of the Georgia Business Corporation Code; and financing of the offer at terms acceptable to Farley.

Contemporaneous with the public announcement of its offer, Farley filed the pending counterclaim in this case seeking to strike down both West Point's Rights Agreement and the application of the Georgia Anti-takeover statute. (For a detailed description of Farley's counterclaim and other related claims, *see* Order dated November 14, 1988, 711 F.Supp. 1088.

On November 2, 1988, the Board of Directors of West Point (the "Board"), after meeting to consider Farley's offer, determined the offer to be "inadequate and not in the best interests of the Company and its shareholders." The Board communicated its position on the Farley offer to the West Point shareholders by way of a letter dated November 3, 1988.

Following a November 10, 1988 hearing, this court preliminarily enjoined the operation of the "flip-in" and exchange provisions of the West Point Rights Agreement. The court, however, declined to rule upon the constitutionality of the Georgia Anti-takeover statute due to the lack of a fully developed record on the issue. West Point has appealed the November 14 order of this court and that appeal is pending before the Eleventh Circuit Court of Appeals.

In addition to the pending litigation, on December 2, 1988, Farley took steps to initiate a proxy contest aimed at replacing the current members of the West Point Board with nominees of Farley. In an attempt to accomplish this end, Farley availed itself of a provision of Georgia law, O.C.G.A. § 14-2-112(c), which provides for the calling of a special meeting of the shareholders upon the written request of holders of 25 percent or more of the outstanding shares of a Georgia corporation. Farley solicited and received in excess of the required number of calls and West Point has scheduled a special meeting of its shareholders on February 25, 1989.

A hearing on the adjudication of the constitutional issues began on January 3, 1989. During the following four days, the parties presented the court with various expert testimony concerning the effects of Article 11A on hostile tender offers for Georgia corporations. The vast majority of the evidence presented was based upon a set of historical data encompassing all hostile tender offers completed between 1981 and 1988. In addition to this live testimony, the court received amicus curiae briefs from both the State of Georgia and the Corporate and Banking Law Section of the State Bar of Georgia supporting the statute.

## THE GEORGIA STATUTORY SCHEME

Effective March 3, 1988, the Georgia General Assembly enacted a "business combinations" statute, O.C.G.A. §§ 14-2-236 *et seq.* (1988), modeled in part upon similar legislation adopted in Delaware and New York. The General Assembly indicated that it adopted the legislation in an attempt to preserve the independence and negotiating position of the boards of directors of Georgia corporations faced with an attempted unsolicited acquisition. *See* Comment to O.C.G.A. § 14-2-237 (1988). To accomplish this end, the statute prohibits for a period of five years certain defined business combinations between a Georgia corporation and any interested shareholder of that corporation, unless certain circumstances occur.

As enacted, the statute applies to all "resident domestic corporations" which "opt into" coverage by the statute through the adoption of a corporate bylaw to that effect. *See* O.C.G.A. § 14-2-238 (1988).

Initially the statute defines a resident domestic corporation as:

(A) An issuer of voting stock which is organized under the laws [of the State of Georgia] and which has at least 100 beneficial owners in the state and either:

(i) Has its principal office located in [Georgia];

(ii) Has at least 10 percent of its outstanding voting shares beneficially owned by residents of [Georgia];

(iii) Has at least 10 percent of the holders of its outstanding voting shares beneficially owned by residents of [Georgia]; or

(iv) Owns or controls assets which represents the lesser of (I) substantial-

ly all of its assets or (II) assets having a market value of at least $25 million
...

O.C.G.A. § 14–2–236(4) (1988).

The statute then goes on to provide that: [A] resident domestic corporation shall not engage in any business combination with any interested shareholder [generally defined as the beneficial owner of 10 percent or more of the voting power of the outstanding shares of a corporation. *See* O.C.G.A. § 14–2–232(1) (1988) ] for a period of five years following the date that such shareholder became an interested shareholder, unless:

(1) Prior to such date the resident domestic corporation's board of directors approved either the business combination or the transaction which resulted in the shareholder becoming an interested shareholder [hereinafter the "Board Approval Exception"];

(2) In the transaction which resulted in the shareholder becoming an interested shareholder, the interested shareholder became the beneficial owner of at least 90 percent of the voting stock of the resident domestic corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned by: (A) persons who are directors or officers, their affiliates, or associates; (B) subsidiaries of the resident domestic corporation; and (C) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender of exchange offer [hereinafter the "90 Percent Tender Exception"]; or

(3) Subsequent to becoming an interested shareholder, such shareholder acquired additional shares resulting in the interested shareholder being the beneficial owner of at least 90 percent of the outstanding voting stock of the resident domestic corporation and the business combination was approved at an annual or special meeting of shareholders by the holders of a majority of the voting stock entitled to vote thereon, excluding from said vote, for the purpose of this paragraph only, the voting stock beneficially owned by the interested shareholder or by (A) any director or officer of the resident domestic corporation, his affiliates, or associates; (B) subsidiaries of the resident domestic corporation; and (C) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer [hereinafter the "Shareholder Vote Exception"].

(b) The restrictions contained in this Code section shall not apply if a shareholder: (1) becomes an interested shareholder inadvertently; (2) as soon as practicable divests sufficient shares so that the shareholder ceases to be an interested shareholder; and (3) would not, at any time within the five-year period immediately prior to a business combination between the resident domestic corporation and such shareholder, have been an interested shareholder but for the inadvertent acquisition.

O.C.G.A. § 14–2–237 (1988).

As elsewhere defined, the statute prohibits those business combinations which result in: (A) A merger or consolidation between the corporation or a subsidiary of the corporation and an interested shareholder or one of its affiliates; (B) Any sale, lease, transfer, or other disposition, other than in the ordinary course of business, of any assets of the corporation to an interested shareholder or its affiliates which have a value in excess of 10 percent of the net value of the corporation; (C) The issuance or transfer of any equity securities of the corporation having an aggregate market value of 5 percent or greater of the market value of the corporation's stock to any interested shareholder or its affiliates; (D) The liquidation or dissolution of the corporation; (E) The reclassification of securities resulting in an increase of 5 percent or more in the number of outstanding shares controlled by an interested shareholder or

its affiliates; or (F) The interested shareholder or its affiliates benefiting from any loans, advances, guarantees, pledges, or other financial benefits or assistance or any tax credits or other tax advantages provided by the corporation. *See* O.C.G.A. § 14-2-236(3) (1988).

### CONTENTIONS OF THE PARTIES

Farley contends that the Anti-takeover statute frustrates the goals of shareholder autonomy and neutrality established by the Williams Act and is thus void under the Supremacy Clause of the United States Constitution. This frustration occurs, according to Farley, because the Act effectively gives the incumbent management of a target corporation a "defacto veto" over an unsolicited tender offer by establishing a regime which results in the incumbent management having the ability to prevent the completion of a tender offer which has not received their approval. Farley contends that this defacto veto arises because the two remaining statutory exceptions to the imposition of the Act's five-year moratorium (both of which require that the acquiror receive the tender of at least 90 percent of the outstanding shares) are "illusory." This is true, according to Farley, because available historical data shows that the 90 percent tender level required by these exceptions has not been, and cannot be, attained by any significant number of hostile bidders.

In addition, Farley contends that the effect of the Anti-takeover statute is to make interstate tender offers for, and subsequent business combinations with, a Georgia corporation sufficiently difficult so as to deter many potential future hostile tender offers for Georgia corporations. The result of this statutory scheme, according to Farley, is to allow the State of Georgia, through this legislation, to impede the free flow of securities in interstate commerce in violation of the Commerce Clause of the United States Constitution.

In response to Farley's contentions, West Point asserts that the Anti-takeover statute does not by its terms address, nor does it seek to regulate, matters under the ambit of the Williams Act; but rather, the Act addresses the timing of certain mergers and other business combinations, an area traditionally governed by state law. Thus, West Point contends no conflict exists between Georgia's Anti-takeover statute and the Williams Act and therefore no Supremacy Clause implications arise. Alternatively, West Point asserts that even should the court find that the Georgia statute and the Williams Act operate to regulate the same matters, no frustration of purpose results because the Georgia statute in no way operates to prevent hostile tender offers from being completed.

In regard to Farley's Commerce Clause attack, West Point asserts that the Anti-takeover statute by its terms regulates both intra- and interstate tender offers evenhandedly and therefore does not discriminate against interstate commerce in violation of the so-called dormant Commerce Clause. According to West Point, the Act is merely a legitimate attempt by the State of Georgia to protect shareholders of Georgia corporations, which while possibly having the effect of deterring some nationwide tender offers, does not impermissibly interfere with the flow of interstate commerce.

### VALIDITY OF THE GEORGIA STATUTE UNDER THE SUPREMACY CLAUSE

Article VI, Clause 2 of the Constitution, the Supremacy Clause, establishes:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Supreme Court has frequently stated that the Supremacy Clause acts to preempt state laws not only where Congress has explicitly mandated federal preemption, but also

> " 'where compliance with both federal and state regulations is a physical impos-

sibility ...,' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941)....'' *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 159, 98 S.Ct. 988, 944, 55 L.Ed.2d 179 (1978).

*CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 1644, 95 L.Ed. 2d 67 (1987).

As has been the case with most, if not all, of the so-called anti-takeover statutes enacted following the Supreme Court's decision in *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Georgia statute does not present a situation in which a tender offeror faces a "physical impossibility" of complying with both the Williams Act and the Georgia statute. In light of this fact, the task of determining whether Georgia's statute frustrates the purposes of the Williams Act becomes the critical test.

In 1968, Congress enacted the Williams Act in an attempt to address a gap in the federal regulation of cash tender offers. *See Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 22, 97 S.Ct. 926, 939–40, 51 L.Ed.2d 124 (1977). As enacted, the Williams Act and various supporting regulations implemented by the SEC impose both disclosure and procedural requirements on parties involved in the tender offer process.

The Act requires tender offerors to file a statement disclosing information about the offer, including: the offeror's identity and background; the source and amount of funds used to finance the offer; the offeror's intentions regarding the post-acquisition disposition of the target (i.e., the liquidation of certain assets, contemplated changes in the target's corporate structure, etc.); and the present extent of the offeror's holdings in the target. *See* 15 U.S.C. § 78n(d)(1) (incorporating by reference 15 U.S.C. § 78m(d)(1)); 17 C.F.R. §§ 240.13d–1, 240.14d–6 (1987).

In addition to disclosure requirements, the Act and accompanying regulations also establish a procedural framework within which a tender offer must move forward. For example, a tendering shareholder may withdraw his/her shares during the time an offer remains open. 15 U.S.C. § 78n(d)(5); 17 C.F.R. § 240.14d–7(a) (1987). If an offer attracts the tender of more shares than are sought by the offeror, the offeror is obligated to purchase the shares on a pro rata basis from all tendering shareholders. 15 U.S.C. § 78n(d)(6); 17 C.F.R. § 240.14(8) (1987). Finally, the offeror must pay the same price for all shares purchased; thus, if the offering price is increased during the pendency of an offer, all tendering shareholders must receive the increased price for their shares regardless of the point at which the shares were actually tendered. 15 U.S.C. § 78n(d)(7).

The clear impetus for, and purpose of the Williams Act is shareholder protection. *See Piper,* 430 U.S. at 26, 97 S.Ct. at 942 (quoting statements of the Williams Act's sponsor, Senator Harrison Williams, to the effect that the Act and its disclosure requirements are intended to protect shareholders); *Id.* at 35, 97 S.Ct. at 946 ("[t]he legislative history ... shows that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer."); *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975) ("The purpose of the Williams Act is to insure that public shareholders ... confronted by a cash tender offer ... will not be required to respond without adequate information ...").

It is also clear, however, that Congress did not intend to choose sides in a contest between an offeror and the target's management; rather Congress sought to insure that the shareholder had enough information to reach an informed decision as to whether or not to tender their shares. As Senator Williams indicated as he introduced the bill to the Senate:

> Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of

the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders while at the same time providing the offeror and management equal opportunity to fairly present their case.

113 Cong.Rec. 854–55 (1967). The Supreme Court has recognized Congress' intent of neutrality and "evenhandedness" in the application of the Act. See e.g., Piper, 430 U.S. at 29, 97 S.Ct. at 943 ("Congress was indeed committed to a policy of neutrality in contests for control.").

Given the silence of the Williams Act on the issue of the Act's preemptive reach, this court is faced with the duty of determining what the proper scope of that reach should be. In this task both the CTS and MITE decisions furnish some guidance, however, those decisions do not fully address the issue presented. In MITE, the court dealt with a statute which directly conflicted with the Williams Act; while in CTS the Court upheld a state statute which placed an intervening step in the tender offer and subsequent control process directly into the hands of the shareholders. Neither of these decisions control the analysis of Georgia's statute; it is unquestioned that there exists no direct conflict, but it is also readily apparent that the statute places in the hands of management, as opposed to the shareholders, a significant role in determining the ultimate outcome of a tender offer.

It is clear that the basic purpose of the Williams Act is shareholder protection. Further, it is apparent that while evenhandedness between management and offeror is not a purpose in and of itself, Congress believed a policy of evenhandedness to be a proper and effective method of achieving the ultimate purpose of shareholder protection. See CTS, 107 S.Ct. at 1645–46; Hyde Park Partners, L.P. v. Connolly, 839 F.2d 837, 849–50 (1st Cir.1988); BNS Inc. v. Koppers Co., Inc., 683 F.Supp. 458, 467 (D.Del.1988); RP Acquisition Corp. v. Staley Continental, Inc., 686 F.Supp. 476, 480 (D.Del.1988).

Since neutrality is but a characteristic of the Williams Act, the fact that a state statute which seeks to protect the interests of shareholders has some incidental effect upon the balance between offeror and target management does not per se contravene the purposes of the Williams Act.

Of course, by regulating tender offers, the Act [Indiana's Control Share Acquisition Statute] makes them more expensive and thus deters them somewhat, but this type of reasonable regulation does not alter the balance between management and offeror in any significant way. The principal result of the Act is to grant shareholders the power to deliberate collectively about the merits of tender offers. This result is fully in accord with the purposes of the Williams Act.

CTS, 107 S.Ct. at 1646 n. 7. (emphasis added); Hyde Park Partners, 839 F.2d at 850.

■ As even Farley concedes, it is legally permissible for state statutes to make completion of a hostile tender offer and subsequent business combinations more difficult provided that the statute does not prevent the completion of such offers absent the approval of the target's board. Thus, the question becomes how far may a state statute permissibly intrude upon the tender offer playing field in favor of either the offeror or target management? See Veere Inc. v. The Firestone Tire & Rubber Co., 685 F.Supp. 1027, 1029–30 (N.D.Ohio 1988); RP Acquisition Corp., 686 F.Supp. at 481–82. The test which has been set forth by other district courts is that first presented by Judge Schwartz in BNS: state statutes, notwithstanding their imposition of "substantial deterrent effects" on tender offers, do not circumvent Williams Act goals, so long as hostile offers which are beneficial to target shareholders enjoy a "meaningful opportunity for success." BNS, 683 F.Supp. at 469; RP Acquisition Corp., 686 F.Supp. at 482.

While recorded legislative history concerning the Georgia statute is scant, it can be presumed that the General Assembly sought to protect shareholders of Georgia corporations from coercive and abusive tender offers. The Anti-takeover Statute

in conjunction with Georgia's Fair Price statute, O.C.G.A. § 14–2–232 *et seq.*, protects shareholders by making post-acquisition mergers more difficult, thereby discouraging coercive two-tiered offers. The Act also has the effect of deterring those "any and all" offers intending to accomplish a control position to be followed by a subsequent freeze-out. In addition, the Anti-takeover statute's five-year merger moratorium has the effect of curtailing the use of highly leveraged offers in which the surviving corporation is encumbered with large amounts of debt incurred by the offeror in gaining control of the corporation.

The General Assembly in crafting Georgia's statute apparently looked to similar legislation in both Delaware and New York and chose to adopt a statute which it believed to contain the most protective provisions of both. Thus, the Georgia statute contains a five-year merger moratorium (similar to New York's statute) and implements a 10 percent foothold and 90 percent threshold level to qualify for an exception to the application of the moratorium (enhancing Delaware's 15/85 percent limits).

West Point maintains that this 90 Percent Tender Exception provides a hostile offeror with a meaningful opportunity to complete a hostile offer and subsequent business combination without the necessity of the offeror gaining board approval for the contemplated transaction. Farley, on the other hand, asserts that the 90 Percent Tender and Shareholder Vote Exceptions are "illusory" and the statute thus gives target management a defacto veto over the vast majority of hostile offers. The question to be addressed therefore is whether Georgia's statute so alters the balance between offeror and management that in effect the statute leaves a truly hostile offeror with no meaningful opportunity to succeed absent the approval of the board it seeks to replace.

In Farley's view the 90 Percent Tender Exception is illusory for two reasons: First, Farley contends the historical data indicates hostile offers have failed to achieve the 90 percent tender level required in order to be excepted from Georgia's

moratorium; Second, the fact that between 8 and 11 percent of all shares are so-called "dead shares" (those shares which would not be tendered into a hostile offer under any circumstances) virtually eliminates any possibility of an offeror reaching the 90 percent tender level.

In support of these contentions Farley presented Dr. Michael Bradley. In reaching his conclusions, Dr. Bradley undertook a study of the data presented by Dr. Gregg Jarrell in the case of *City Capital Associates Limited Partnership v. Interco, Inc.*, 696 F.Supp. 1551 (D. Del.1988) (the *"Interco* data"). Dr. Bradley initially reclassified the *Interco* data to reflect his modification of Dr. Jarrell's definition of the term "hostile" tender offer. Whereas, Dr. Jarrell classified a hostile offer as an offer in which no written merger agreement is ultimately signed, *see RP Acquisition Corp.*, 686 F.Supp. at 482; Dr. Bradley classified a hostile offer as those offers in which *either* the offer never receives the approval of the target's board of directors *or* there is not a significant number of insider shares tendered into the offer.

This reclassification reduced the number of so-called "hostile/hostile" transactions (those transactions which remained hostile to the end, receiving neither board approval nor significant insider tendering) from 29 in the *Interco* data (employing Dr. Jarrell's definition of hostile) to 8 transactions in Dr. Bradley's data set. *See* Plaintiff's Exhibit 6. Of these 8 hostile/hostile transactions, Dr. Bradley concluded that only one, the Shell Oil transaction, reached the 90 percent tender level required to avoid the application of the merger moratorium under the Georgia statute. Dr. Bradley further qualified this conclusion by pointing to the fact that in the Shell Oil transaction the offeror began with a 69 percent foothold position and thus would be precluded from using the 90 Percent Tender Exception under Georgia's statute.

Dr. Bradley concluded at trial that Georgia's 90 Percent Tender Exception is "virtually impossible" to achieve. This conclusion was inconsistent with Dr. Bradley's earlier affidavit opinion that the exception

was "impossible" to achieve. Dr. Bradley explained, however, that he revised his earlier opinion after learning that during Capital Cities' recent bid for Interco, which while not ultimately successful (and therefore not included in Dr. Bradley's data set), the offeror received the tender of more than 90 percent of outstanding shares while the offer remained hostile.

In relation to so-called dead shares, Dr. Bradley relied upon four studies including a study he conducted which analyze the number of non-responsive shares in historical tender offer transactions. *See* Plaintiff's Exhibit 26. Based on these studies, Dr. Bradley concluded that in friendly/friendly and hostile/friendly transactions the historical non-tender rate approximated 11 percent. Dr. Bradley then postulated that in hostile/hostile offers he would expect a *non-response rate* of between 8 and 11 percent; thus virtually assuring that a hostile offeror would be unable to achieve a 90 percent tender level based on these non-responsive shares alone.

Based on these analyses and observations, Dr. Bradley opined that where an offer has not received the approval of the target's board, a hostile offeror would find it "virtually impossible" to achieve the 90 percent tender level required to be excepted from the application of Georgia's moratorium.

West Point, in support of its position that Georgia's statutory exceptions to the application of the moratorium provide an offeror a meaningful opportunity to complete a hostile offer, presented Dr. Donald Margotta. Dr. Margotta, in support of his conclusions reviewed the work of both Dr. Jarrell and Dr. Bradley, synthesizing their data to comport with his definition of a hostile tender offer. Dr. Margotta defined a hostile offer as an offer which never received the approval of the target's board of directors. Using this definition Dr. Margotta reclassified the *Interco* data to include 12 hostile/hostile transactions. *See* Defendant's Exhibit 68. Dr. Margotta's 12 hostile/hostile transactions included the 8 Bradley transactions plus an additional 4 transactions which Dr. Bradley had classi-

fied as hostile/friendly applying his definition of hostile. (Additionally, the Margotta set includes the offers for Revelon, Cannon Mills, Quotron and Vulcan). Of the 12 hostile/hostile transactions, Dr. Margotta excluded 4 transactions which he considered to be distinguishable and unhelpful. These transactions were excluded because they were either two-tiered offers in which the offeror sought less than all the outstanding shares of the target or because they were transactions involving only a small amount of money thus indicating the reduced likelihood that the shares would be widely held by sophisticated investors (arbitrageurs, institutional investors, etc.). From this, Dr. Margotta concluded that 3 of the remaining 8 transactions (38%) would have literally met the requirements of Georgia's 90 Percent Tender Exception.

In addition to the preceding analysis, Dr. Margotta looked at all hostile tender offers for Delaware corporations initiated after the enactment of Section 203 (Delaware's Anti-takeover statute). *See* Defendant's Exhibit 69. West Point also presented evidence through Mr. Matthew Czajkowski, an investment banker with Goldman, Sachs & Co., indicating that there continues to be substantial tender offer activity involving Delaware corporations even after the enactment of Section 203. *See* Defendant's Exhibit 38. While none of post-section 203 transactions fit either expert's definition of a hostile/hostile offer, Dr. Margotta points to 3 offers (Grand Metropolitan's bid for Pillsbury, Doskocil's bid for Wilson Foods and City Capital's bid for Interco) to show that each exceeded Delaware's 85 percent tender requirement and each would come close to, or exceed, Georgia's 90 percent tender requirement, if adjusted to reflect Georgia's insider share exclusion. (Pillsbury—89.3%; Wilson Foods—87%; Interco—achieved 93% tender while outstanding and hostile although bid was ultimately unsuccessful). Thus, Dr. Margotta opines that hostile bidders faced with super-majority tender levels are not precluded from completing hostile offers; but rather will be able to succeed by restructuring their offers to attract the requisite number of shares.

In relation to the issue of dead shares, Dr. Margotta prefaces his discussion with the caveat, also recognized by Dr. Bradley, that there is no method of reliably predicting the number of dead shares to be expected in any pending offer. With this in mind, Dr. Margotta takes issue with Dr. Bradley's use of historical non-responsive share data and asserts that shares which are not tendered into an offer are not necessarily dead shares. Dr. Margotta contends that truly dead shares are only those shares which can literally not be reached (by reason of ignorance of ownership; ignorance of a pending offer; incorrect and unforwardable shareholder addresses or contested share ownership). Accepting this definition, Dr. Margotta asserts that the actual number of truly dead shares is but a subset of the non-responsive shares measured by Dr. Bradley. Thus, Dr. Margotta concludes that Dr. Bradley's 8–11 percent figure overstates the number of dead shares to be expected.

Based on these analyses, Dr. Margotta opined that the Georgia statute would not prevent the completion of hostile tender offers which are in the best interests of shareholders and that such offers could be completed without the approval of the target board through the use of the 90 Percent Tender Exception.

## THE CONSTITUTIONALITY OF THE GEORGIA STATUTE

■ The court must acknowledge that the Georgia statute is entitled to a presumption of constitutional validity. *See Lemon v. Kurtzman*, 411 U.S. 192, 208, 93 S.Ct. 1463, 1473, 36 L.Ed.2d 151 (1973) *citing San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 60, 93 S.Ct. 1278, 1311, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring) ("one of the first principals of constitutional adjudication [is] the basic presumption of the constitutional validity of a duly enacted state ... law."). After considering all the evidence presented, the court concludes that Farley has failed to carry its burden of showing that the Georgia statute prevents hostile offerors from enjoying a meaningful opportunity to complete a hostile offer and subsequent post-acquisition business combination absent board approval.

Any attempt, no matter how well intentioned, to place labels (friendly/friendly, hostile/friendly or hostile/hostile) on a historical group encompassing hundreds of transactions is bound to be exceedingly difficult. This fact is heightened by the problems and conflicts encountered in this case. While the court finds the definition of hostile employed by Dr. Bradley to be the most reasonable one, what is clear is that in many instances such labeling requires that a subjective determination be made in order to classify many transactions. The outcome of these subjective determinations vastly influence the ultimate percentage of successful or unsuccessful transactions in a given group of transactions. It is, however, these percentages which are presented as the primary basis upon which a party claims that an offeror will or will not enjoy a meaningful opportunity to succeed.

A problem also exists as to the applicability of the historical data itself to the issues at hand. This problem results because there is not enough information presently available to predict with the required degree of legal certainty whether or not Farley's offer has a meaningful opportunity to succeed. Simply put, the court is not convinced that the information now available relative to the level of ownership achieved in past tender offers is sufficient to serve as an accurate forecast of what levels future offers may achieve in the face of Georgia's 90 percent threshold. Prior to the recent enactment of this and similar statutes offerors had little incentive to reach a level of 90 percent ownership. Faced with the prospect of a five-year merger moratorium that incentive is now clearly present and offerors may be able to structure future offers in such a manner so as to achieve that goal. On the other hand, there is a substantial possibility that this 90 percent threshold may invite management to act to establish a "blocking coalition" by placing 10 percent of the corporation's shares in the hands of loyal constituents (i.e., banks, insurance companies, etc., which maintain a business relationship with

the corporation). These entities, not excludable as insiders under the statute, would then control enough shares to block any hostile offer, thus making a corporation "takeover-proof." Any evidence as to these potentialities is, however, speculative at best at the present time and unsupported by the current record. In fact, Farley concedes that it has produced no evidence at the present time to support a claim that West Point has acted to establish any blocking coalition.

In addition, the universe of hostile/hostile transactions which would serve as the most pertinent universe in which to analyze the attainability of the 90 Percent Tender Exception is exceedingly small. As identified by the parties this group contains only between 8 and 12 transactions. As even Farley recognizes, either explicitly or impliedly, the size of this limited data set presents extreme problems as to the statistical relevance of any conclusions which are drawn therefrom.

Finally, as to the issue of dead shares, the court finds the data inconclusive. The court agrees that the use of historical data reflecting non-responsive tender rates probably overstates the potential obstacle presented by truly dead shares. This non-responsive data includes many shares which might have been withheld for any number of reasons other than an inability to respond to the offer. In this case we are dealing with a well-publicized offer for the shares of a widely-held public corporation whose officers and directors control only 1 percent of its shares. All indications are that an offer for such a corporation would likely have far fewer truly dead shares than the historical non-responsive rate presented by Farley. While truly dead shares apparently exist, Farley's historical average undoubtedly over estimates their number.

In light of the foregoing, Farley's reliance upon the present compilation of historical data is insufficient to show that a hostile offeror is prevented from enjoying a meaningful opportunity to complete a hostile offer in the face of Georgia's statute. Farley may well be correct and ultimately it may be determined that the Georgia statute does in fact deny a hostile offeror a meaningful opportunity to complete a hostile offer and subsequent business combination absent board approval; however, based upon the evidence presented the court is unable to reach such a conclusion. Thus, Farley has failed to overcome the statute's presumption of constitutional validity under the Supremacy Clause of the Constitution.

## THE VALIDITY OF THE GEORGIA STATUTE UNDER THE COMMERCE CLAUSE

The Commerce Clause of the United States Constitution grants Congress the power to "regulate commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. This clause, however, has long been interpreted as not merely an affirmative grant of power to Congress but also as a negative restriction upon the power of the states. *See Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852). Thus, independent of preempting federal legislation the Commerce Clause may limit the regulatory power of a state relating to interstate commerce. *See e.g., CTS*, 107 S.Ct. at 1648–49; *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36–37, 100 S.Ct. 2009, 2015–16, 64 L.Ed.2d 702 (1980).

The *CTS* Court established a test to follow in evaluating state corporation laws against the standard of the Commerce Clause. Presently state statutes must be evaluated under three tests to ascertain whether they impermissibly violate the negative restrictions of the dormant Commerce Clause. First, does the state law discriminate against interstate commerce? *See CTS*, 107 S.Ct. at 1648; *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Second, does the state law subject an interstate actor to inconsistent regulations thereby adversely impacting interstate commerce? *See CTS*, 107 S.Ct. at 1649; *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 671, 101

S.Ct. 1309, 1316–17, 67 L.Ed.2d 580 (1981) (plurality opinion of Powell, J.); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448, 99 S.Ct. 1813, 1821, 60 L.Ed. 2d 336 (1979). Third, does the state law impose a burden upon interstate commerce which is "clearly excessive" in relation to its putative local benefits? *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

The Georgia statute does not directly discriminate against interstate commerce. The statute does not favor in-state offerors over out-of-state offerors but rather when triggered applies to *all* implicated business combinations. *See CTS*, 107 S.Ct. at 1648–49. Thus, it "visits its effects equally upon both interstate and local business." *Id.* at 1649. The statute therefore passes muster under the first test.

Likewise, the Georgia statute does not subject interstate activities to an impermissible risk of inconsistent regulation. The Georgia statute, by its terms, applies only to corporations created under Georgia law. As *CTS* holds: "So long as each State regulates voting rights [or analogously business combinations] only in the corporations it has created, each corporation will be subject to the law of only one state." *Id.* The statute therefore passes muster under the second test.

There is some question as to whether a court should administer the third or so-called *Pike* balancing test. *See CTS*, 107 S.Ct. at 1652–53 (Scalia, J., concurring) (The [*"Pike* test] is ill-suited to the judicial function and should be undertaken rarely if at all."); *Hyde Park Partners*, 839 F.2d at 844. The Supreme Court, however, clearly engaged in such balancing in *MITE, see MITE*, 457 U.S. at 643–46, 102 S.Ct. at 2641–42, and applied some form of a balancing test in *CTS, see CTS*, 107 S.Ct. at 1652 ("To the limited extent that the Act affects interstate commerce, this is justified by the State's interests in defining the attributes of shares in its corporations and in protecting its Shareholders."); *see also id.* at 1652–53 (Scalia, Jr., concurring) (implicitly stating that the majority of the Court applied a balancing test).

The interest of a state in enacting legislation governing the internal affairs of corporations created under its laws has been clearly recognized by the Supreme Court. *See, e.g., CTS*, 107 S.Ct. at 1650. As the Court stated in *CTS*, "A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as insuring that investors in such corporations have an effective voice in corporate affairs." *Id.* at 1651. This role of the State as "overseer of corporate governance" encompasses a state interest in "preventing the corporate form from becoming a shield for unfair business dealing." *Id.*

The Georgia General Assembly determined that an effective way to protect shareholders of Georgia corporations from unfair business dealings such as abusive and coercive tender offer practices was through the enactment of a business combinations statute. This court should not and cannot now impose its view of the propriety or effectiveness of adopting a business combinations statute rather than a control share acquisition statute or other statutory scheme aimed at accomplishing a similar end. *See CTS*, 107 S.Ct. at 1651 *citing Kassel v. Consolidated Freightways Corp.*, 450 U.S. at 679, 101 S.Ct. at 1321 (Brennan, J., concurring in judgment). Thus, unless the purported state interests served by this statute are excessively outweighed by the burdens which the statute imposes upon interstate commerce the statute withstands Commerce Clause attack.

Farley contends that the statute creates an overriding burden upon the interstate securities market. This overriding burden results, according to Farley, because the effect of the statute is to make interstate tender offers for Georgia corporations, and any subsequent mergers between the acquiror and target, sufficiently difficult so as to deter many hostile bids. This resulting chilling effect will impact interstate commerce by impeding the free flow of securities and thereby impairing the liquidity of national securities markets. In addition, Farley contends that the statute interferes with the efficient allocation of corpo-

**1108**

rate resources by shielding incumbent management from the performance incentive created by the potential of hostile tender offers. *See* Easterbrook & Fischel, *The Proper Role of a Target's Management in Responding to a Tender Offer*, 94 Harv.L.Rev. 1161, 1173–74 (1981).

These contentions are, however, severely undercut by Farley's inability to establish with the required degree of legal certainty that the Georgia statute denies hostile tender offers for Georgia corporations a meaningful opportunity to succeed. Therefore, even if the statute does deter to some extent future hostile offers, the Supreme Court has clearly indicated that this fact does not "offend" the Commerce Clause. *CTS*, 107 S.Ct. at 1652.

## CONCLUSION

Farley's motion for a preliminary injunction and declaratory judgment are therefore DENIED.

SO ORDERED.